# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

JENNIFER KRISTEN KIRK,     )
                                 )
           Plaintiff,       )
                                 )
        v.               )     16 C 3497
                                 )
ADVOCATE HEALTH AND     )
HOSPITALS CORPORATION, an    )
Illinois Not-for-Profit Corporation    )
d/b/a ADVOCATE MEDICAL     )
GROUP                      )
                               )
          Defendant.    )

## MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

On March 22 2016, Dr. Jennifer Kristen Kirk ("Kirk") filed a four-count complaint against Advocate Health and Hospitals Corporation, an Illinois Not-for-Profit Corporation d/b/a Advocate Medical Group ("AMG"). The complaint alleged the following causes of action: Sexual Discrimination and Sexual Harassment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq.* ("Title VII"), as amended by the Civil Rights Act of 1991 and the Illinois Human Rights Act, 775 ILCS 5/1-101 *et seq.* ("IHRA") (Counts I & II); Retaliation in violation of Title VII (Count III); and Breach of Contract (Count IV). Advocate seeks summary judgment in its favor on all counts.

Discovery has now been completed, permitting the Court's consideration of AMG's Motion for Summary Judgment ("Motion") as to all claims against it. For the following reasons, the Court grants the Motion as to Counts I, II, and III. Count IV, the Breach of Contract count, is dismissed without prejudice.

## BACKGROUND

The following facts taken from the record are undisputed, except where otherwise noted.

### a. Kirk's Hiring and Patient Coverage Issues

On April 22, 2014, Kirk entered into an Employment Agreement with AMG. On June 16, 2014, Kirk started working for AMG at the Advocate Good Samaritan Hospital ("Good Samaritan") as a general surgeon, where she reported to Manoj Shah, M.D. ("Shah"), AMG Medical Director of Surgery, Advocate Lutheran General Hospital Director of Trauma and Surgery, and Governing Council Member.

At the time Kirk began, AMG already had a group of five trauma surgeons who took general surgery call in Good Samaritan's emergency room: Grace Chang ("Chang"), Jim Cole ("Cole"), Amy Stewart ("Stewart"), Mike Iwanicki ("Iwanicki"), and Vijay Nair ("Nair") (collectively, "Trauma Group"). With Kirk's arrival, a new four-person general surgery group was to be formed with Iwanicki and Nair coming from the Trauma Group, and Kirk and another doctor operating out of Good Samaritan, Mohan Airan ("Airan"). Kirk understood that Airan, approximately 80-years-old at the time, would be transferring his robust private practice to AMG.

The discovery record reflects that in September 2014, Kirk's relationship with Airan deteriorated following an incident in the operating room. Airan, disagreeing with Kirk's planned surgical approach, dramatically stepped away from the operating table, removed his gown and gloves, threw them to the floor, and left the room before the procedure began. Kirk contends that Airan displayed "malicious and libelous behavior" following the incident by declaring to Good Samaritan staff that Kirk was an unsafe doctor and poor surgeon.

Kirk also asserts that Airan, as an employee of AMG, was part-and-parcel of the "large corporate entity" that discriminated against her in something of a general discrimination scheme. Kirk ascribes this corporate misconduct to a great many individuals, a charge AMG vigorously disputes.

Airan's disdain for Kirk led, in part, to what she contends was a recurring problem in obtaining coverage of her patients when she was absent. In order to retain medical staff membership at Good Samaritan, Kirk was obligated to find alternative coverage for her patients during her absences. This required the securing of a "current active, medical staff member" at Good Samaritan to cover her when necessary, one who held the same or similar privileges as Kirk.

Kirk knew that if she was out of town, "the expectation was that [she] would find coverage for [her] practice" by "signing out" her patients to Airan, the Trauma Group, or privileged Good Samaritan colleagues, although Kirk claims that she never received instruction from AMG on the appropriate "sign out" procedure. AMG

alleges that it never prevented Kirk from utilizing the coverage process, and both parties agree that there was never time off that Kirk was unable to take because she could not secure coverage, including holidays.

In April 2015, Kirk for the first time asked the Trauma Group to cover her. Chang did so, leaving notes on the patient's chart that Kirk opined were "defensive and inflammatory." Chang's note read: "I am seeing this patient because Dr. Kirk is out of town. I have never seen this patient before in my life. I was not present at this patient's surgery and I'm just seeing the patient because Dr. Kirk is not here." Later that same month, Kirk met with Shah to inform him that the Trauma Group was unhappy about having to cover her patients, that Airan was refusing to cover her patients, and that Nair and Iwanicki were only available to cover her when they were in-house taking their trauma rotation.

On August 18, 2015, Kirk claims that Shah told her that the Trauma Group would not cover her patient while she was away for 48 hours taking her son to college. The day before Kirk's August 18 discussion with Shah, Chang assisted Kirk with a complex surgery. Chang called Shah on August 18 to inform him of a complication during surgery and to make it clear to Shah that the Trauma Group "broadly" would not cover the patient in Kirk's absence. AMG contends that later that same day, Stanley told Kirk that despite Chang's statement to Shah, Iwanicki agreed to cover her.

Kirk contends that, in her August 18 discussion with Shah, after he told her that nobody from the Trauma Group would assist her while she was away, Shah asked her not to leave town. Kirk responded that she would secure competent coverage from outside the Trauma Group, which she did. Kirk states that Stanley failed to inform Kirk that Iwanicki would cover her until after she acquired independent coverage. Kirk further claims that she refused Stanley's offer of Iwanicki's help because she felt uncomfortable accepting the Trauma Group's assistance following Shah's divulgence that the trauma surgeons did not want to cover her patients.

The parties agree that at no time did the members of the Trauma Group ever personally tell Kirk that they would not cover her. But, according to Kirk, her superiors repeatedly told her that the Trauma Group would not cover her, and therefore, she was forced to seek coverage from doctors at Good Samaritan who were not AMG employees. Moreover, Kirk claims that the Trauma Group would cover Airan's general surgery cases. AMG notes, however, that Kirk did not know if the Trauma Group was uncomfortable covering for Airan, if he ever used someone outside the trauma group for coverage, or who from the Trauma Group ever actually covered Airan. Kirk further contends that, after August 2015, Iwanicki and Nair ignored her email requests for coverage and did not agree to cover her patients.

On August 27, 2015, Kirk, Shah, Stanley, and Nancy Christie ("Christie"), AMG's Vice President of Operations, met to discuss the "issue of call coverage." Determining that Kirk's issues were a "serious" problem, Shah asked for a month to

respond due to how busy he was. AMG and Kirk agree that at neither this meeting nor at any other time while she was employed by AMG did Kirk mention that she believed that the treatment she was receiving was sex-based or make any allegations of sexual harassment or retaliation.

According to AMG, Shah responded to Kirk's concerns by speaking to both the Trauma Group and Kirk about improving communications and considering Kirk's request for hiring another surgeon. Kirk denies that Shah seriously considered her proposals at the August 27 meeting.

When asked to identify who discriminated against her in the context of coverage, Kirk stated that she did not know, but that "men and women, Nancy, Christie, Manoj Shah" and others did not respond to her. Kirk also claims that when she went to Shah on three separate occasions with complaints about Airan and the lack of coverage from her male partners, Shah raised unsubstantiated claims of medical mismanagement on Kirk's behalf.

### b. Sexual Harassment

Kirk believes that Iwanicki made inappropriate sexual comments and gestures towards her in four ways: (1) in the fall of 2014, in the back work room of the general surgery office, Iwanicki said, "I'm a shoe guy and those shoes are fucking sexy," in the presence of nurse practitioner Gina Kidder ("Kidder"); (2) between the fall of 2014 and summer of 2015, at least four times in the hallway, Iwanicki said, "Hey, Kirk, let me see your shoes," occasionally in the presence of Kidder and the general

public; (3) on August 26, 2015, at a medical staff appreciation dinner, Iwanicki greeted Kirk, embraced her, and tried to kiss her face, mouth, and neck, and said, "You are so fucking hot," in the presence of Kirk's husband; and (4) on December 3, 2015, while in the ER in the presence of a patient and an ER physician, Iwanicki said, "That's the fucking sexiest outfit I've ever seen." Kirk only ever heard Iwanicki make sex-based comments.

Kirk "assumed" that AMG had harassment, EEOC, and non-retaliation policies, and knew that AMG had a Human Resources department ("HR"), but she never reported any of her concerns to HR. Kirk adds that she was embarrassed by Iwanicki's actions and was worried about creating further potential conflict by pointing out Iwanicki's behavior on the heels of her coverage issues. The first time Kirk complained of sexual harassment was through her lawyer after she resigned on February 4, 2016.

### c. Peer Review

On November 14, 2013, Kirk signed AMG's "Advocate Healthcare Network Applicant's Consent and Release" form in connection with her application for clinical privileges at Good Samaritan. Kirk understood that her Employment Agreement required continuous compliance with AMG and Good Samaritan's bylaws, rules, and policies, but could not recall whether she saw such bylaws prior to or at the time of her hire, nor if she saw them at all while employed by AMG.

Good Samaritan's Medical Staff Peer Review Process utilizes Clinical Quality Committees ("CQCs") to provide peer review of its staff. The CQC is designed to improve quality of care and can receive cases for review for any myriad of reasons. Kirk believes that she likely saw peer review policies and peer review worksheets during her time serving on Good Samaritan's CQCs.

AMG utilized other processes for peer review as well, one of which called for external review and was applied system-wide, including at Good Samaritan. This process is promulgated in Advocate Health Care's Medical Staff Peer Review Policy and Procedure. Kirk denies that this document authorizes coordinated peer review between Good Samaritan and AMG employees, and she further claims that such coordinated review was only adopted after Kirk resigned from AMG.

According to AMG, its Chief Medical Officer and Vice President of Medical Management Kevin McCune, M.D. (McCune"), made presentations to various bodies throughout the AMG network about the peer review process. These presentations included discussion of coordinated peer review between AMG and the hospitals, a process AMG says went back years. Kirk denies that any formal process for coordinated peer review existed between AMG and the hospitals prior to her departure.

In August 2016, five months after Kirk filed this lawsuit, Advocate Health Care's Medical Staff Peer Review Process Policy and Procedure was amended to include a system of process, referral, and peer review letters – promulgated in a

flowchart used in peer review at AMG for years – that AMG claims have been in place since 2010 or 2011. Kirk denies that this system has been in place at AMG or used since 2011.

### d. Quality of Care Issues

Around October 2015, Charles Derus, M.D. ("Derus"), Good Samaritan's Vice President of Medical Management, became aware of a number of quality of care issues concerning Kirk. She had an "extremely high" number of cases reviewed by the surgical CQC. David DeHaan ("DeHaan"), Chair of the Surgical CQC from the DuPage Medical Group, ███████████████████████████████████████ ████████████████████████ Additionally, a number of surgeons and chairs of different departments expressed serious quality concerns about Kirk. Kirk denies that these conversations ever actually took place or that they were documented. If they did occur, Kirk asserts that they were initiated by Derus, who she claims was seeking out quality issues involving Kirk at the time.

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████ but does not know who performed this review. She also does not know of any other "opportunities for

improvement" or No-opportunities-for-improvement ratings assigned to any other surgeons in her practice.

In response to these issues, AMG contends that Derus and DeHaan, █ ████████████████████████ decided to use "joint AMG hospital cooperation" to determine if there was a pattern to Kirk's quality of care issues. Kirk denies that Derus and DeHaan ever came to such a conclusion or that they had the authorization of any committee or policies to so conclude.

On October 27, 2015, McCune and AMG Executive Vice President Rishi Sikka agreed that they would use Good Samaritan's peer review files within the context of AMG peer review, supported by AMG medical management. On or around the same date, AMG contends that Derus sent a letter, in his capacity as designee of the Advocate Good Samaritan Hospital Peer Review Committee, to the AMG Peer Review Committee designating AMG to perform the peer review. Kirk claims that this letter did not exist on October 27, 2015, noting that the letter was not produced until discovery, and that no copy of the letter could be located in either Derus' personal records or AMG's files. Derus testified that he re-signed the letter on January 4, 2016, two days after Kirk resigned, because AMG could not locate the original. Kirk also denies that Derus sent the letter pursuant to any policy of AMG's.

On December 3, 2015, Kirk attended a meeting with Shah, Christie, and Derus, expecting to discuss coverage issues. Instead, she was informed that all of her CQC-reviewed cases were going to be independently reviewed and that, until that review

was complete, she was barred from seeing any new patients or operating. On December 17, 2015, then-AMG President James Dan ("Dan") sent Kirk a letter confirming that she was suspended with pay, but would continue to see follow-up postoperative patients. AMG contends that it was McCune who primarily made the suspension decision, since AMG had the ability to tell Kirk what she "can and cannot do." Kirk denies that it was McCune who was primarily responsible, instead blaming her suspension on a "collective decision."

As to her suspension, Kirk was paid throughout, but the parties dispute as to whether her clinical privileges were suspended. AMG claims that they were not; Kirk contends that the effect of the suspension was to interfere with her clinical activity or at least her ability to exercise her clinical privileges at Good Samaritan.

Derus and Shah managed Kirk's review process, selecting general surgeon Michael Sherrow ("Sherrow") from Dreyer Medical Group to review nineteen of Kirk's cases. On December 21, 2015, Shah gave Kirk a letter signed by McCune that informed her of her continued suspension, included a summary of the peer review findings, and requested any comments related to the findings to be provided to McCune by January 4, 2016. ████████████████████

████████████████████████████████████

██████████

**e. Kirk's Departure from AMG**

On January 1, 2016, Kirk submitted a letter to Dan and McCune stating that rather than having been suspended with pay, she had taken a voluntary leave of absence from performing surgery as she awaited an intended discussion about the peer review findings. The letter also stated that Kirk disagreed with Sherrow's findings, was terminating her Employment Agreement effective January 2, 2016, and was resigning from the Medical Staff. AMG states that three days later, on January 5, 2016, Sherrow's report was presented to the AMG Peer Review Committee, which Kirk denies ever occurred.

On January 29, 2016, McCune called Kirk to inform her that she was being reported to the National Practitioner Data Bank ("NPDB") as having resigned while under investigation. McCune thought he was required to make the NPDB report by federal law. On February 1, 2016, Kirk responded with a letter hoping to have the investigation closed out. On February 2, 2016, AMG submitted a report to the NPDB. Two days later, AMG submitted a correction report to the NPDB that removed the substantive findings of AMG's investigation into Kirk's quality of care issues, and merely described Kirk's resignation as having occurred during AMG's "ongoing investigation of her related to quality of care issues." Kirk believes that the February 2 report was submitted maliciously, in bad faith, and was retaliatory in nature. On February 22, 2016, Kirk included in the NPDB report a statement disagreeing with AMG's report and providing her version of events.

Following her resignation, Kirk was unable to secure at least two jobs because of the NPDB report, but eventually was hired as a general surgeon at Amita on April 4, 2016, with salary and benefits at least as great as what she received at AMG.

## LEGAL STANDARD

A motion for summary judgment requires the Court to construe all facts and draw all reasonable inferences in favor of the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact arises where a reasonable jury could find, based on the evidence of record, in favor of the non-movant. *Anderson*, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court considers the "record as a whole." *Morgan v. Harris Trust and Sav. Bank of Chicago*, 867 F.2d 1023, 1026 (7th Cir. 1989).

Northern District of Illinois Local Rule 56.1 requires the "party moving for summary judgment to include with the motion 'a statement of material facts as to which the moving party contends there is no genuine issue and that entitles the moving party to a judgement as a matter of law.'" *Ammons v. Aramark Unif. Serv*s., Inc., 368 F.3d 809, 817 (7th Cir. 2004) (quoting N.D. Ill. R. 56.1(a)(3)). "The movant bears the initial burden of showing that no genuine issue of material fact exists." *Genova v. Kellogg*, 2015 WL 3930351, at *3 (N.D. Ill. 2015). "The burden then shifts to the non-moving party to show through specific evidence that a triable issue of fact

remains on issues on which the movant bears the burden of proof at trial." *Id*. The non-moving party must respond to the movant's Local Rule 56.1(a)(3) statement and may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits. N.D. Ill. R. 56.1(b); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The non-movant must support her contentions with documentary evidence of specific facts that demonstrate that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324.

## DISCUSSION

### I. Sexual Discrimination

#### A. IHRA Claim

AMG argues that Kirk's IHRA claim should be dismissed because she has failed to present evidence that she exhausted her remedies under the IHRA prior to bringing suit. Kirk declined to address this argument in her response, save for a single footnote stating that the Illinois Department of Human Rights informed her that she would "be able to file a civil action under the Human Rights Act on June 17, 2017." This reads to the Court as a concession that Kirk improperly included the IHRA claim in the original complaint, either because it was unripe or the Court lacked jurisdiction. Moreover, "failing to press [a claim] before the district court" constitutes waiver in and of itself. *Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 810 (7th Cir. 2001).

Because Kirk has failed to press her IHRA claim and appears to have altogether abandoned it, summary judgment is granted in favor of AMG on the IHRA portion of Count I.

## B. Title VII

Courts in the Seventh Circuit analyze Title VII sexual discrimination claims under two standards. We address each in turn.

### i. *Ortiz* reasonable factfinder standard

Under *Ortiz,* we ask "simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's…sex…caused the discharge or other adverse employment action." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016); *see Cole v. Board of Trustees of Northern Illinois University*, 838 F.3d 888, 899 (7th Cir. 2016) (internal citations omitted) ("the critical question…is simply 'whether a reasonable jury could infer prohibited discrimination'"). The evidence before the Court must be considered as a whole, not bit by bit. *Ortiz*, 834 F.3d at 760.

Kirk identifies two adverse actions that resulted from sexual discrimination at AMG: (i) difficulty obtaining coverage; and (ii) heightened scrutiny that eventually led to her peer review and suspension. The Court finds that Kirk's own deposition testimony by and large refutes these claims.

As to the issue of coverage, Kirk opens her response to AMG's Motion with the assertion that her "three male partners had practice coverage, but she did not." This declaration is thoroughly contradicted by Kirk's testimony. A substantial portion

of Kirk's issues flow from her alleged inability to obtain coverage from the surgeons in the Trauma Group. And yet, Kirk testified that neither Cole, Stewart, nor Chang ever declined to cover her. Rather, when she asked each doctor to cover her, two separate times for each surgeon, they agreed on every occasion. Moreover, Kirk states that neither Nair nor Iwanicki ever refused to cover her when asked to do so.

Although the Trauma Group never declined to cover her when asked, Kirk asserts that she was told by Shah that the Trauma Group did not want to cover her. Kirk also maintains that Airan consistently refused to cover her. Construing these facts as true for purposes of summary judgment, such declinations would arguably, thought not conclusively, constitute adverse treatment on AMG's part. However, to sustain a Title VII sex-based discrimination action, Kirk's adversity must be the product of just that, her sex. In her own deposition, Kirk explains that her coverage issues were nothing of the sort.

As to the Trauma Group's apparent refusal to cover her patients – which, again, contradicts Kirk's testimony that the Trauma Group covered for her *at least* six separate times, not including those occasions when Nair and Iwanicki covered for her – Kirk testified to the Trauma Group's reasoning:

> I was specifically told back in February of 2014 the other three trauma surgeons were not interested in general surgery, didn't want to perform general surgery, and my assumption was then they were not interested in taking care of my general surgery patients.

When asked whether she understood that the Trauma Group generally did not want to cover general surgery, Kirk responded, "That was my vibe. I had been told that before I was even employed." This is a frank admission that Kirk knew even before she began working for AMG that the Trauma Group would be unlikely to cover her patients because they were not interested in general surgery. More importantly, it is a wholesale rejection of the legal contention that her adverse treatment was sex-based. Kirk consistently offers lucid explanations suggesting why the Trauma Group refused to aid her; beyond the occasional conclusory allegation, at no point do her explanations broach the topic of her sex.

Moreover, when Shah told Kirk that the Trauma Group would not cover her while she was out of town in August 2015, AMG was still able to cover Kirk's patient. Stanley informed Kirk that Stanley had spoken to Iwanicki, who agreed to cover her. Kirk only rejected this offer because she had already secured independent coverage from another physician. AMG made Kirk aware of the Trauma Group's disinclination to cover her general surgery practice, and then actively tried to rectify the problem when that group would not help Kirk while she was away. No reasonable factfinder could be expected to discern adverse treatment out of a working relationship where an employer proactively sought aid for its employee when she was in a bind.

As to Airan's individual refusal to help with coverage, Kirk comprehensively explained Airan's reason, as well. First, Kirk flatly agreed that she never believed

anything that Airan did was "discriminatory on the basis of sex." Then, Kirk articulated why the two of them did not get along, admitting that it was because "he disagreed with my planned surgical approach" prior to the commencement of a surgery. In the same discussion about why Airan refused to cover her, Kirk reiterated that "[she] outlined to him how [she] planned to do [the surgery] and he disagreed." Airan's unhelpfulness with Kirk, per Kirk's testimony, stemmed entirely from his opinion of her as a physician, which by its own terms is not sex-based.

When Kirk discussed her and Airan's difficulties with Shah, she also desired to speak to Shah about the "malicious" and "libelous" accusations Airan was allegedly making about Kirk to different Good Samaritan staff members. These accusations, according to Kirk, were confined exclusively to her capabilities as a doctor, as informed by Airan's incident with her prior to surgery. Kirk never tethers Airan's rumor-spreading to her gender.

For similar reasons, Kirk fails to demonstrate that a material fact exists suggesting possible sex discrimination surrounding her peer review. When Kirk called Shah to discuss Airan's alleged back-fence talk and refusal to cover her, the two also broached Airan's concern for Kirk's surgical decision-making. In this conversation, Kirk agreed that Shah needed to take seriously the raising of such a clinical concern. Shah then brought up the peer review process of incidents like these, and Kirk further agreed that peer review exists for the betterment of the reviewee and for AMG's patients' well-being.

Additionally, the August 27 meeting between Kirk, Shah, Stanley, and Christie was held only nine days after Chang, a female doctor, alerted Shah to a complication that she believed Kirk had in the operating room. Kirk provided in her deposition a detailed account of the divergence of opinion between she and Chang, which concerned the propriety of a common bile duct procedure Chang assisted Kirk with and notified Shah of. Whether Chang's opinion was correct or not, Kirk herself confessed to Shah that such concerns needed to be taken seriously. ████

████████████████████████████████████████████████

While the Court expresses no opinion on Kirk's capability as a surgeon, it does note the burgeoning awareness amongst AMG executives that Kirk was having performance complications at Good Samaritan. Around the same time that Kirk was raising coverage issues, Derus was becoming aware of a number of Kirk's complications in the hospital, including that she had a high number of cases that had come up for review by the surgical CQC. Derus was also told by the Chairman of the Radiology Department that Kirk was sustaining complications excessive in both their volume and severity. The chairman of the robotics committee expressed similar concern to Derus about a robotics case of Kirk's that had a bad outcome. Finally, Derus discussed with DeHaan the number and frequency of Kirk's cases the CQC was reviewing.

The undisputed common thread of the factual record as supplied by both parties is a recurring unease over Kirk's clinical performance, a concern Kirk testified to

being sympathetic to.  Indeed, it is Kirk's own deposition testimony that suggests that her quality of care issues underpinned AMG's peer review.

Nowhere in Kirk's deposition, denials, or cited evidence does she tie her gender to the initiation of her peer review, the process by which the review was conducted, or AMG's decision to suspend her.  Even her legal charge narrowly frames the peer review process as AMG retaliating against her for her complaints about coverage, exclusive of her gender.  Mimicking Kirk's handling of her coverage issues, Kirk's contention that sex was the basis for her peer review is presented only as a conclusion. This amounts to a failure to produce evidence suggesting that AMG's initiation of peer review had anything to do with her gender.  Under the *Ortiz* standard, no reasonable factfinder could find that Kirk's sex led to her adverse treatment.

### ii.   *McDonnell Douglas* **burden-shifting standard**

A plaintiff can also establish a case of gender discrimination with the *McDonnell Douglas* burden-shifting standard.  411 U.S. 792, 802 (1973).  Under this model, Kirk must demonstrate that: (1) she was a member of a protected class; (2) she was performing to AMG's legitimate expectations; (3) despite her performance, she suffered an adverse employment action; and (4) others, similarly situated but not in the protected class, were treated more favorably.  *Id*.  If Kirk can establish these elements, the burden shifts to AMG to demonstrate a legitimate, non-discriminatory reason for Kirk's treatment.  *Geier v. Medtronic, Inc.*, 99 F.3d 238, 241—42 (7th Cir.

1996). If AMG meets this burden, Kirk must demonstrate that the proffered explanation is pretextual. *Id.*

While the evidence clearly demonstrates that AMG's executives were informed of complications Kirk was having as a physician, it does not inhere that Kirk was unquestionably falling short of AMG's expectations. A small percentage of her claims went to the CQC, she received five "Excellent" ratings for her clinical performance, and Good Samaritan entrusted her with the responsibility of reviewing other doctors' performance in her role on the CQCs. A reasonable factfinder could find that Kirk met AMG's legitimate performance expectations.

Whether Kirk's paid suspension from clinical activities is demonstrative of an adverse action is a separate question, one courts in this district have come to opposing conclusions on. *Compare Myart v. Doubletree Hotels Corp.*, 2002 WL 63814, at *5 (N.D. Ill. 2002) (unpublished) (finding that a paid suspension is not an adverse employment action, similar in nature to the Seventh Circuit's holding on progressive discipline), *with Turner v. Marshall Field & Co.*, 1999 WL 168465, at *8 (N.D. Ill. 1999) (unpublished) (finding that a suspension where an employee experienced no loss in pay could, despite the lack of case law on the issue, constitute an adverse employment action). Here, Kirk's suspension was less a wholesale exclusion from her professional duties, and more of an intermediate step, since Kirk was allowed to continue seeing patients in post-op, retained her clinical privileges at Good Samaritan, and was paid in full throughout. The Court finds that Kirk's suspension pending

review was not an adverse employment action. *See Nichols v. Southern Illinois University-Edwardsville*, 510 F.3d 772, 787 (7th Cir. 2007) ("placement of [plaintiff] on paid administrative leave pending the results of his fitness-for-duty psychological examinations did not constitute a *materially* adverse action").

The final step in the analysis is whether similarly situated unprotected individuals at AMG were treated more favorably than Kirk. As her response outlines, Nair and Iwanicki were not similarly situated to Kirk since they were primarily employed as part of the Trauma Group. Airan, however, was exclusively part of general surgery, and therefore the ideally similarly situated physician for purposes of Title VII analysis. Airan was also, like Kirk, subject to CQC review. Therefore, if Airan was treated more favorably than Kirk, her prima facie case would be established and the burden would shift to AMG.

Kirk, however, offers nothing in the way of evidence to raise an issue of material fact on this matter. There is nothing in the record suggesting, and Kirk does not argue in her brief, that Airan received better treatment from AMG where coverage was concerned. Kirk does contend that AMG's failure to subject Airan to peer review, despite her complaints about his breaking scrub and defaming her around the hospital, demonstrated favorable treatment. Kirk also contends that because neither Airan nor her other male colleagues were subjected to the particular brand of peer review that Kirk underwent, she must have been treated unfavorably.

The law, however, requires of Kirk "a showing of *sufficiently analogous misconduct*" by Airan "to support an inference that she was treated more harshly because of her sex." *Kuttner v. Zaruba*, 819 F.3d 970, 976 (7th Cir. 2016). Kirk testified to the string of clinical complications she endured prior to AMG's initiation of peer review. But the record is silent on whether Airan sustained analogous difficulties. Kirk does not even address whether Airan's "breaking scrub" is something he is not permitted to do or if it is an act that would draw the ire of AMG's reviewing committees. Having identified Airan as the doctor with whom she is similarly situated, Kirk has the burden of demonstrating that AMG handled Airan's sufficiently analogous clinical misdeeds with a more favorable regard. A record devoid of Airan's clinical performances or missteps – or any other male doctors at Good Samaritan who might conceivably be construed as similarly situated – is incapable of carrying this burden.

Because Kirk has failed to demonstrate that she was treated less favorably than similarly situated male physicians, she cannot satisfy the burden-shifting standard. Since neither the *McDonnell Douglass* nor the *Ortiz* reasonable factfinder standards have been met, summary judgment is granted in favor of AMG on Kirk's sexual discrimination claim.

## II.   Sexual Harassment

To prevail on a sexual harassment action, Kirk must show that "(1) she was subjected to unwelcome sexual harassment; (2) the harassment was based on sex; (3)

the harassment unreasonably interfered with her work performance by creating an intimidating, hostile or offensive working environment that seriously affected her psychological well-being; and (4) there is a basis for employer liability." *Moser v. Indiana Dept. of Corrections*, 406 F.3d 895, 902 (7th Cir. 2005).

As AMG rightly notes, Kirk's only comment in her response brief that might be construed as argument in support of her sexual harassment claim is in the second paragraph of her introduction. The statement reads, "Iwanicki subjected Kirk to sexual harassment through repeated comments about her shoes and clothing as well as an unwanted sexual advance at a medical staff function in August 2015." This sentence does nothing to address the third or fourth prongs of the sexual harassment test. It also does nothing to rebut AMG's fully briefed arguments that Kirk can demonstrate neither the severity, pervasiveness, or offensiveness of Iwanicki's conduct nor a basis for AMG's liability.

"It is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered." *Liberles v. Cook County*, 709 F.2d 1122, 1126 (7th Cir. 1983). Arguments not raised before the district court in response to summary judgment are waived. *Arendt v. Vetta Sports, Inc.*, 99 F.3d 231, 237 (7th Cir. 1996); *see also Cent. States, Se. and Sw. Areas Pension Fund v. Midwest Motor Express*, 181 F.3d 799, 808 (7th Cir. 1999) ("Arguments not meaningfully developed in any way are waived"). Because Kirk has neglected to develop any argument on the matter, the

Court finds that she has abandoned her sexual harassment claim, and summary judgment is granted in favor of AMG on Count II. *See Donelson v. City of Chicago*, 272 F.Supp.2d 717, 726 (N.D. Ill. 2003) (finding that the plaintiff abandoned her Title VII sexual harassment claim where her response provided "no legal argument in support of a hostile work environment claim and makes no serious effort to respond to the [defendant's] arguments against it").

Briefly, the Court notes that even had Kirk addressed the merits, it is unlikely that she would have been able to demonstrate the employer liability prong. Kirk never reported Iwanicki's comments to anyone with a position of authority at AMG. As AMG notes, courts "do not consider an employer to be apprised of the harassment unless the employee makes a concerted effort to inform the employer that a problem exists." *Rhodes v. Ill Dep't of Transp.*, 359 F.3d 498, 506 (7th Cir. 2004). Therefore, Kirk's sexual harassment would fail on the merits, as well.

## III.    Retaliation

To make out a claim of retaliation under Title VII, Kirk must show that: "(1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) a causal connection exists between the two." *King v. Ford Motor Company*, 2017 WL 4349308, at *5 (7th Cir. 2017). Because Kirk cannot establish the first prong, her retaliation claim fails.

To show that her activity was statutorily protected, Kirk's complaint must indicate that her discrimination occurred because of her gender. *Tomanovich v. City*

*of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006). Kirk's discussion of potentially protected activity is limited to her complaints "about disparate treatment regarding coverage." Indeed, Kirk's response thoroughly details the numerous complaints she took to her AMG superiors about her inability to obtain coverage. She states that her male partners would not cover her and that she explained to her superiors that this "lack of coverage from her male colleagues" was an issue.

There are two glaring problems with this argument. First, it flies in the face of the evidence. In her deposition testimony, Kirk flatly admitted to never suggesting to her superiors that her coverage issues were due to her sex. Second, Kirk herself described both the Trauma Group and Airan's discrete reasons for declining to cover Kirk, as discussed *supra* in § I.B.i. In neither instance did those explanations implicate Kirk's gender.

This stark divide, between Kirk's gender and her issues obtaining coverage and complaints outlining those issues to AMG, defeats her retaliation claim. In *Tomanovich*, 457 F.3d at 664, the Seventh Circuit held that because the plaintiff failed to "point to any evidence that in complaining to the City he indicated the alleged harassment was based upon his sex or was sexual harassment," he could not show that his grievance constituted protected activity for purposes of Title VII's anti-retaliation provisions. We reiterate this rationale today. Because Kirk fails to point to any evidence showing that in complaining to AMG she indicated her alleged discrimination was based on her sex – and in fact, can only point to testimony

describing an inability to obtain coverage for distinctly non-gender-based reasons – she cannot demonstrate that she engaged in statutorily protected activity under Title VII. Summary judgment is granted in favor of AMG on Count III.

## IV.    Breach of Contract

AMG's Motion for Summary Judgment is, accordingly, granted as to Counts I, II, and III. Because the Court has awarded summary judgment in favor of AMG on Kirk's three federal claims, we decline to exercise supplemental jurisdiction over Kirk's state law breach of contract claims pursuant to 28 U.S.C. § 1367(c)(3). *See Thurman v. Village of Homewood*, 446 F.3d 682, 687 (7th Cir. 2006) (1367(c)(3) discretion to decline jurisdiction over state law claims was proper following summary judgment against plaintiff on federal claims). Kirk's breach of contract claim is dismissed, without prejudice.

## CONCLUSION

For the aforementioned reasons, the Court grants the Motion in part and enters judgment in AMG's favor and against Kirk on Counts I, II, and III. Count IV is dismissed without prejudice. It is so ordered.


_____

Dated: 11/14/2017                Charles P. Kocoras
                                 United States District Judge